UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, 100 F Street, N.E. Washington, D.C. 20549 | : : : : | |
| Plaintiff, | : : | C.A. No. |
| v. | : : | |
| LUCENT TECHNOLOGIES INC., | : : | |
| Defendant. | : : | |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("the Commission") alleges:

### NATURE OF THE ACTION

1.      From at least 2000 to 2003, Lucent spent over $10 million for approximately 1,000 Chinese foreign officials, who were employees of Chinese state-owned or state-controlled telecommunications enterprises, to travel to the United States and elsewhere. The Chinese government enterprises were either entities to which Lucent was seeking to sell its equipment and services or existing Lucent customers. The majority of the trips were ostensibly designed to allow the Chinese foreign officials to inspect Lucent's factories and to train the officials in using Lucent equipment. In fact, during many of these trips, the officials spent little or no time in the United States visiting Lucent's facilities. Instead, they visited tourist destinations throughout the United States, such as Hawaii, Las Vegas, the Grand Canyon, Niagara Falls, Disney World, Universal Studios, and New York City.

2.     In authorizing and improperly recording the payments for approximately 315 trips for Chinese government officials that had a disproportionate amount of sightseeing, entertainment and leisure, Lucent violated the books and records and internal control provisions of the Foreign Corrupt Practices Act of 1977 ("FCPA"). Lucent lacked the internal controls to detect and prevent trips intended for sightseeing, entertainment and leisure, rather than business purposes. Lucent also improperly recorded many of the trips in its books and records. For example, over 160 trips were booked to Lucent's "Factory Inspection Account" even though the customers did not visit a Lucent factory at any time during the trip.

3.     Lucent's violations occurred because Lucent failed, for years, to properly train its officers and employees to understand and appreciate the nature and status of its customers in China in the context of the FCPA. Many of Lucent's Chinese customers were state-owned or state-controlled companies that constituted instrumentalities of the government of China and whose employees, consequently, were foreign officials under the FCPA. The Chinese foreign officials who traveled at Lucent's expense were often identified by Lucent in its internal documents as "decision makers" with respect to awarding new business. Notwithstanding these facts, the chairman and president of Lucent's wholly-owned subsidiary in China ("Lucent China") and other Lucent China executives authorized and paid for Chinese government officials to visit the United States and other countries without appropriate oversight concerning the purpose and content of those visits.

4.     Plaintiff brings this action to enjoin such acts and practices, which violate Sections 13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

2

5.    The defendant will, unless restrained and enjoined, continue to engage in the acts and practices set forth in this complaint and in acts and practices of similar purport and object.

## JURISDICTION

6.    This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa]. The Defendant made use of the means or instrumentalities of interstate commerce, of the mails, or the facilities of a national securities exchange in connection with the acts, transactions, practices and courses of business alleged herein.

## DEFENDANT

7.    **Lucent**, during the relevant time period, was a provider of communications networks for telecommunications service providers; it designed and provided systems, services and software. Lucent, which was incorporated in Delaware in November 1995, was formerly part of AT&T Corporation's systems and technology unit but was spun off from AT&T in 1996. On November 30, 2006, Lucent completed a merger with Alcatel SA. The new entity, Alcatel-Lucent, is incorporated in France and has its world headquarters in Paris, France. Lucent survives as a wholly-owned subsidiary of Alcatel-Lucent. During the relevant period of time, Lucent's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and was listed on the New York Stock Exchange. Thus, during the relevant time period, Lucent was an "issuer" as that term is defined in Section 3(a)(8) [15 U.S.C. § 78(c)(a)(8)] of the Exchange Act. Following the merger, American Depository Shares of Alcatel-Lucent began trading on the New York Stock Exchange.

3

## FACTS

### Lucent China Business Background

8.      In 1997, Lucent was awarded a contract by the Chinese government, in which
Lucent was to provide a high-speed optical transmission system for China.  In 1998, Lucent and
the Chinese Ministry of Post and Telecommunication signed a Memorandum of Cooperation in
the Telecommunication Industry.  In 2000, Lucent set up its largest manufacturing center outside
the United States in Qingdao, China, and launched a Bell Labs research center in Beijing.
Between 2001 and 2003, Lucent signed several contracts worth hundreds of millions of dollars
each with Chinese customers.  By early 2002, for example, Lucent had sold 20 million lines of
switching equipment in the China market.  By 2003, revenues from its customers in China
accounted for 11% of Lucent's consolidated revenues.

### Lucent China Trip Logistics

9.      From at least 2000 to 2003, Lucent provided and paid for approximately 1,000
Chinese government officials to take approximately 315 trips to the United States that contained
a disproportionate amount of sightseeing, entertainment and leisure time and expense in
comparison to the business content of the trips.  On some occasions, the Chinese officials spent
as little as one or two days on legitimate business, while spending up to two weeks on Lucent-
funded sightseeing, entertainment and leisure.  Lucent generally categorized the trips as "pre-
sale" or "post-sale," depending on whether the company was seeking new business from the
given customer ("pre-sale"), or the trip was made in connection with an existing contractual
arrangement ("post-sale").  During this period, Lucent spent more than $1 million on
approximately 55 "pre-sale" trips and more than $9 million on approximately 260 "post-sale"
trips.

10.     Lucent China funded the travel for the Chinese officials through its sales department. In order to arrange for a given trip, Lucent employees typically prepared a "Customer Visit Request Form" that provided information about the proposed travel. The form, which was used to request and obtain internal approval from Lucent China executives for the expenditures on the trips, included information about the identity of the travelers and the purpose of the trip. Each Request Form, for example, asked: "Are the visitors decision-maker/influencers?" Typically, the response was in the affirmative. The Forms also provided space for the Lucent sales staff to indicate whether "Sightseeing/Entertainment" was "required" and for other information about the proposed arrangements, including the quality of requested accommodations.

11.     Upon approval by Lucent China executives, Lucent China employees based in Lucent's U.S. headquarters in New Jersey arranged the logistics of the trips. These employees, known as the China Operations Support Team ("China Ops"), established itineraries and typically utilized one of two travel agents to make flight, hotel, and other arrangements. These employees also were often responsible for setting up the business content of given trips by, for example, arranging for a Lucent executive to meet the visiting Chinese delegation. The proposed itineraries, including those that explicitly provided for minimal business activity in relation to the entertainment and leisure time and expense, were reviewed and approved by Lucent China staff and executives.

12.     Although Chinese government officials were routinely identified by name, organization, and title in the Customer Visit Request Forms, Lucent China's internal controls provided no mechanism for assessing whether any of the trips violated the FCPA. Moreover, Lucent employees made little or no inquiry regarding whether the Chinese visitors were

5

government officials under the FCPA, and no Lucent policies or controls were triggered with respect to whether the entertainment and leisure activities Lucent paid for could constitute things of value under the FCPA, or whether the purpose of the visit may have violated the anti-bribery provisions of the FCPA.

### "Pre-Sale" Visits

13.     From at least 2000 to 2003, Lucent provided approximately 330 Chinese government officials of various levels with all-expense-paid visits to the United States and elsewhere to participate in conferences or seminars held or attended by Lucent employees, visit Lucent facilities, and engage in sightseeing, entertainment and leisure activities. Lucent spent more than $1 million on at least 55 of these visits, known as "pre-sale" visits, and used them to discuss business opportunities with certain high-ranking Chinese government officials. The pre-sale visits were typically requested and approved by employees and officers of Lucent China and implemented by Lucent's China Ops team.

14.     For example, in June 2002, Lucent paid more than $34,000 for the Deputy General Manager of a Chinese government majority-owned telecommunications company ("Customer No. 1") and the Deputy Director of the Technical Department of Customer No. 1 to visit the United States. This visit consisted of three days of business activity and more than five days of sightseeing, entertainment and leisure, including visits to Disney World and Hawaii. In several internal documents related to the trip, Lucent identified the Deputy General Manager of Customer No. 1 as a "key customer" and "decision maker" for Code Division Multiple Access ("CDMA") business. In describing the trip, a Lucent e-mail states that the visit was "very important for us" because it was "an opportunity for enhancing [Lucent's] relationship with [the deputy manager of Customer No. 1] before [the] Phase 2 CDMA project." In October 2002,

Lucent was awarded a portion of the CDMA Phase 2 project by Customer No. 1, worth a reported $428 million to Lucent.

15.    On another occasion, in April 2001, six officers and engineers of Customer No. 2, an existing Lucent customer that was a subsidiary of a Chinese government majority-owned telecommunications company, visited the United States for a period of two weeks at Lucent's expense. One of Lucent's objectives for the trip was to negotiate a memorandum of understanding between Lucent and Customer No. 2. Although the Chinese officials spent five days visiting Lucent facilities in Illinois, New Jersey, and Colorado, they spent nine days traveling, at Lucent's expense, between cities and visiting Boston, Las Vegas, the Grand Canyon, and Hawaii for sightseeing, entertainment and leisure activities. In its internal documents, Lucent identified the purpose of the trip, which cost Lucent more than $73,000, as a "gold [sic] opportunity for Lucent to introduce our network operation center to [Customer No. 2]." Lucent also noted that Customer No. 2 was considering the services of competing vendors for particular telecommunications products. In connection with authorizing the pre-sale visit, Lucent estimated $500 million in revenues in potential business with Customer No. 2. Lucent identified these six visitors from Customer No. 2 in internal documents as "decision-makers or influencers," and one of the visitors, a vice president at Customer No. 2, reported directly to the head of Customer No. 2.

16.    Many of the pre-sale visits were booked improperly in Lucent's books and records. For example, Lucent's expenses for the Customer No. 1 visit described above were booked as "Services Rendered – Other Services." Lucent used this expense account to credit certain "other services" expenses, and it was not intended to be used as a repository for travel expenses pertaining to pre-sale trips. In addition, Lucent's expenses for the Customer No. 2 visit

7

described above were booked as a "Transportation International" expense. This expense account was legitimately to be used only for "costs of international freight forwarded and transportation provider services where the product crosses country borders." Lucent also improperly booked the costs of several other similar customer or potential customer pre-sale visits as "Transportation International" expenses.

### "Post-Sale" Visits

17.    From at least 2000 to 2003, Lucent and its Chinese government customers typically included provisions in their contracts requiring Lucent to provide these customers with expense-paid trips to the United States and other nations under the labels of "factory inspections" or "training." These trips were referred to as "post-sale" visits because Lucent's obligation to provide the trips arose pursuant to existing contracts. Under the guise of fulfilling its contractual obligations, Lucent paid more than $9 million on approximately 260 "post-sale" trips to the United States and other nations that often involved little or no business content. More than 850 individuals, chosen by Lucent's Chinese customers, made the trips. Often, the customers dictated the content and locations of the trips. Lucent personnel accompanied customers during the visits, arranged the logistics of the trips and paid for airfare, hotel accommodations, meals, sightseeing tours, and per diems. Lucent China employees and executives requested and approved these "post-sale" visits and Lucent's China Ops Team implemented them.

### "Factory Inspections"

18.    Some of the "post-sale" visits were ostensibly for factory inspections. Under certain contracts with its Chinese customers, Lucent was obligated to provide "factory inspection" tours, which were intended to demonstrate to the customers the technologies and products that Lucent was providing to them under their contract. Beginning in approximately

8

2001, however, Lucent began relocating its manufacturing operations to various locations, including China, leaving few factories in the United States for the customers to visit. Rather than provide factory inspections to the Chinese customers in locations where Lucent actually operated factories -- as the contracts literally required -- Lucent arranged for its customers to visit the United States and other locations, including Australia and Europe, even though the locations they visited had no Lucent factories. The visits became primarily sightseeing, entertainment and leisure trips, although one day of the visit would generally involve touring Lucent's headquarters or a Lucent facility (but not a factory) in order to create the appearance of legitimacy.

19.    Lucent employees knew that the company provided purported factory inspection tours to Chinese officials that involved little or no business purpose and that false descriptions of the "factory tours" could be used to help the Chinese customers obtain visas or get through immigration controls in the United States. For example, in one instance, a Lucent employee stated in an e-mail that an invitation letter to a Chinese official, purportedly including a factory inspection in its itinerary, could be used to "verify this visit to INS upon [the customer's] arrival to San Francisco. . . . However, we have concerns as well because the whole itinerary shows this trip is just for sightseeing without business purpose. If the INS officers check their flight ticket and visit program, we think they will get [into] trouble." Despite these risks, Lucent sponsored the customers' entry into the United States under the pretense of a business trip, while knowing that only sightseeing, entertainment and leisure activities would be taking place.

20.    In approximately June 2001, Lucent paid for six employees of a unit of a Chinese-government-owned investment company ("Customer No. 3") to go sightseeing in Niagara Falls, Las Vegas, the Grand Canyon, and elsewhere as part of a "factory inspection." In this instance, the Chinese officials had specific requests for sightseeing locales that the customer

9

communicated to Lucent, and Lucent made efforts to accommodate the visitors' desires. The visitors were described in Lucent's internal documents as "decision-makers" or "influencers" and included two Deputy Division Directors for Customer No. 3. A Lucent e-mail discussing the coordination and planning of the trip stated: "Please pay special attention on [sic] this customer request from [Customer No. 3] . . . . [Customer No. 3] is planning for the Phase-2 (South-West) backbone expansion and we are already facing competition from [two competing telecommunications companies]." Another Lucent e-mail stated: "I know it is not easy to arrange [Customer No. 3] to meet operators in U.S. But we need to do this . . . . We are fighting for 20M expansion project with [a competing telecommunications company]. One thing customer complained about [to] us that [sic] [this same competing telecommunication company] agreed to arrange" meetings with operators in the United States. The e-mail continued: "We have to agree to this request under such competition." During this June 2001 trip, Lucent successfully obtained the Customer No. 3 Backbone ONG Phase 2 contract, valued at $23 million. The Chinese officials visited New York, Washington, Niagara Falls, Las Vegas and the Grand Canyon on this two week trip, approximately half of which was spent on leisure activities.

21.    Lucent improperly recorded the $46,854 cost for the Customer No. 3 visit as a "Lodging" expense. According to internal Lucent documents, this expense account was to be used for "the cost of lodging incurred by or on behalf of Lucent employees on Company business." In this instance, Lucent customers, not Lucent employees, generated the sightseeing, entertainment, leisure and business travel costs, and the expenses Lucent improperly recorded went well beyond lodging.

22.    In November 2002, two delegations from Customer No. 1 visited the United States pursuant to a contract that required Lucent to invite representatives "from the Buyer to the

United States for the Factory Inspection for a period of two weeks." Pursuant to the contract,

Lucent was "responsible for the expenses of international airfare, US domestic travel, lodging

and boarding in the US, and [a] reasonable allowance." The two delegations totaled nineteen

people, and each group's two-week trip involved just one day at Lucent's Holmdel, New Jersey

factory. The rest of the time was spent on sightseeing, entertainment and leisure activities in

locations such as New York City, Washington, D.C., Niagara Falls, Las Vegas, Los Angeles, the

Grand Canyon, San Diego and Hawaii at a cost to Lucent of over $130,000. Although the trips

were designated in the company's books and records as "factory inspections," Lucent internal

communications stated that these "post-sale" visits were actually used to conduct "pre-sale" type

sales pitches for Lucent products. More specifically, Lucent recognized that "[Customer No. 1]

currently is planning to invest in their Network Management systems," and that there was

expected to "be an approx. 4-million dollar opportunity for Lucent" in upcoming quarters.

Consequently, during the trip, Lucent sought to promote certain of its network management

products to the Chinese customers, which included "one of the key decision makers for their

network management system upgrade." Lucent improperly recorded expenses for this Customer

No. 1 visit as "Services Rendered – Other Services."

     23.     In December 2001, Lucent paid $33,600 for six employees of a subsidiary of a

Chinese-government-majority-owned telecommunications company ("Customer No. 4") to visit

the United States for ten days of sightseeing, entertainment and leisure, including trips to

Disneyland, the Grand Canyon and Hawaii. Lucent, as noted in its internal documents, foresaw

$2-3 billion in potential business opportunities with Customer No. 4, with possible competition

from other telecommunications companies which were perceived by the customer to have price

and service advantages over Lucent. The visitors, whom Lucent identified as "decision-

11

maker/influencers," refused to participate in the east coast portion of the trip, which would have included a visit to Lucent facilities, because of their concerns following the events of September 11, 2001. Nevertheless, the Chinese visitors proceeded to travel to the United States at Lucent's expense solely for sightseeing, entertainment and leisure purposes. Lucent improperly recorded its expenses for these visitors' sightseeing trip in its "Factory Inspection" account, despite the fact that there had been no visit to a Lucent factory at any point during the visit.

### "Training" Visits

24.     Lucent also provided customers with post-sale "training" visits that were designed to offer some training with respect to Lucent's products, but often included extensive sightseeing, entertainment and leisure activities. A typical training visit involved engineers or technical employees from Chinese government owned or controlled companies who visited the United States and received some bona fide training at a Lucent facility, but were treated to a disproportionate amount of sightseeing, entertainment and leisure activities, as well as per diems, in relation to the time and expense spent on the legitimate training. Lucent also paid for the transportation costs, meals, and lodging for its customers when they traveled from the training facility to other non-training related locations.

25.     On at least one occasion, Lucent hosted a delegation of six engineers from a subsidiary of a Chinese-government-majority-owned telecommunications company ("Customer No. 5"), for a twenty-one day training visit in the United States in May 2002. The delegation consisted entirely of engineers from Customer No. 5, one of whom supervised Customer No. 5's planning development department. The visitors were described on Lucent's Customer Visit Request Form as "influencers." Lucent identified in its internal documents a potential $6 million business opportunity in 2002 with Customer No. 5 for purchase of Lucent's Synchronous Digital

12

Hierarchy product. The visit consisted of five days of Lucent training in Orlando, Florida, and, thereafter, sixteen days of sightseeing, entertainment and leisure in locations such as San Francisco, Los Angeles, San Diego, Las Vegas, the Grand Canyon, New York City, Washington, D.C., and Hawaii. Of the $46,828.08 bill, more than $11,000 was spent on airline tickets, more than $8,000 on per diems, more than $8,000 on transportation around and between the various cities, and more than $2,000 on tickets to various tourist attractions. The expenses for this trip were improperly recorded in Lucent's accounting records as "Service Rendered – Other Services."

## FIRST CLAIM FOR RELIEF

### Violations of Section 13(b)(2)(A) of the Exchange Act

26.     Paragraphs 1 through 26 above are realleged and incorporated by reference herein.

27.     As set forth more fully above, Lucent failed to make and keep books, records, or accounts that, in reasonable detail, accurately and fairly reflected the transactions and disposition of its assets.

28.     As a result of the foregoing, Lucent violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

## SECOND CLAIM FOR RELIEF

### Violations of Section 13(b)(2)(B) of the Exchange Act

29.     Paragraphs 1 through 26 above are realleged and incorporated by reference herein.

30.     As set forth more fully above, Lucent failed to devise, maintain, and implement a system of internal accounting controls sufficient to provide reasonable assurances that payments were made in accordance with management's general or specific authorization.

31.     As a result of the foregoing, Lucent violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

## PRAYER FOR RELIEF

WHEREFORE, the Securities and Exchange Commission respectfully requests that this Court enter a Final Judgment:

(a)     permanently restraining and enjoining defendant Lucent, its officers, agents, employees, assigns, attorneys, and those persons in active concert or participation with them who receive actual notice of the Final Judgment, and each of them, from violating Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act;

(b)     ordering defendant Lucent to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

    (c)    granting such other and further relief as this Court deems just and appropriate

under the circumstances.

Dated:  December 11, 2007
        Washington, D.C.

 

Richard E. Simpson
Attorney for Plaintiff
U.S. Securities and Exchange Commission
100 F St., N.E.
Washington, D.C. 20549-4030
(202) 551-4492 (telephone)
(202) 772-9246 (Fax)

Of Counsel:

Christopher R. Conte
Kevin M. Loftus
Craig Welter

## CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION | LUCENT TECHNOLOGIES, INC. |

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT ___Union County, NJ___
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Richard E. Simpson
U.S. Securities and Exchange Commission
100 F St., N.E.
Washington, DC 20549-4030
Tel: (202) 551-4492

**ATTORNEYS (IF KNOWN)**

Martin J. Weinstein, Esq.
Willkie Farr & Gallagher, LLP
1875 K Street, NW
Washington, D.C. 20006
Tel: (202) 303-1122

### II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- (⦿) 1 U.S. Government Plaintiff
- (○) 2 U.S. Government Defendant
- (○) 3 Federal Question (U.S. Government Not a Party)
- (○) 4 Diversity (Indicate Citizenship of Parties in item III)

### III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | (○) 1 | (○) 1 | Incorporated or Principal Place of Business in This State | (○) 4 | (○) 4 |
| Citizen of Another State | (○) 2 | (○) 2 | Incorporated and Principal Place of Business in Another State | (○) 5 | (○) 5 |
| Citizen or Subject of a Foreign Country | (○) 3 | (○) 3 | Foreign Nation | (○) 6 | (○) 6 |

### IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

**(○) A. Antitrust**

- ☐ 410 Antitrust

**(○) B. Personal Injury/ Malpractice**

- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

**(○) C. Administrative Agency Review**

- ☐ 151 Medicare Act

Social Security:
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**(○) D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**(⦿) E. General Civil (Other)**        OR        **(○) F. Pro Se General Civil**

**Real Property**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**Personal Property**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**Bankruptcy**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**Property Rights**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**Federal Tax Suits**
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**Other Statutes**
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☒ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○  **G.** *Habeas Corpus/ 2255* | ○  **H.** *Employment Discrimination* | ○  **I.** *FOIA/PRIVACY ACT* | ○  **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○  **K.** *Labor/ERISA (non-employment)* | ○  **L.** *Other Civil Rights (non-employment)* | ○  **M.** *Contract* | ○  **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Foreign Corrupt Practices Act of 1977 (15 U.S.C. § 78)

**VII. REQUESTED IN COMPLAINT**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ _____   Check YES only if demanded in complaint   JURY DEMAND:   YES ☐   NO ☒

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE December 21, 2007   SIGNATURE OF ATTORNEY OF RECORD   *Richard E. Life*

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | C.A. No. |
| | : | |
| v. | : | |
| | : | |
| LUCENT TECHNOLOGIES INC., | : | |
| | : | |
| Defendant. | : | |

## CONSENT OF DEFENDANT LUCENT TECHNOLOGIES INC.

1.    Defendant Lucent Technologies Inc. ("Defendant") acknowledges having been served with the complaint in this action, enters a general appearance, and admits the Court's jurisdiction over Defendant and over the subject matter of this action.

2.    Without admitting or denying the allegations of the complaint (except as to personal and subject matter jurisdiction, which Defendant admits), Defendant hereby consents to the entry of the final Judgment in the form attached hereto (the "Final Judgment") and incorporated by reference herein, which, among other things:

        (a)    permanently restrains and enjoins Defendant from violating Sections 13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78m(b)(2)(A), 15 U.S.C. § 78m(b)(2)(B)]; and

        (b)    orders Defendant to pay a civil penalty in the amount of $1,500,000 under Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)].

3.     Defendant agrees that it shall not seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made pursuant to any insurance policy, with regard to any civil penalty amounts that Defendant pays pursuant to the Final Judgment, regardless of whether such penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of investors. Defendant further agrees that it shall not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, or local tax for any penalty amounts that Defendant pays pursuant to the Final Judgment, regardless of whether such penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of investors.

4.     Defendant waives the entry of findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

5.     Defendant waives the right, if any, to a jury trial and to appeal from the entry of the Final Judgment.

6.     Defendant enters into this Consent voluntarily and represents that no threats, offers, promises, or inducements of any kind have been made by the Plaintiff or any member, officer, employee, agent, or representative thereof to induce Defendant to enter into this Consent.

7.     Defendant agrees that this Consent shall be incorporated into the Final Judgment with the same force and effect as if fully set forth therein.

8.     Defendant will not oppose the enforcement of the Final Judgment on the ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure, and hereby waives any objection based thereon.

9.     Defendant waives service of the Final Judgment and agrees that entry of the Final Judgment by the Court and filing with the Clerk of the Court will constitute notice to Defendant

2

of its terms and conditions. Defendant further agrees to provide counsel for the Plaintiff, within thirty days after the Final Judgment is filed with the Clerk of the Court, with an affidavit or declaration stating that Defendant has received and read a copy of the Final Judgment.

10.    Consistent with 17 C.F.R. § 202.5(f), this Consent resolves only the claims asserted against Defendant in this civil proceeding. Defendant acknowledges that no promise or representation has been made by the Commission or any member, officer, employee, agent, or representative thereof with regard to any criminal liability that may have arisen or may arise from the facts underlying this action or immunity from any such criminal liability. Defendant waives any claim of Double Jeopardy based upon the settlement of this proceeding, including the imposition of any remedy or civil penalty herein. Defendant further acknowledges that the Court's entry of a permanent injunction may have collateral consequences under federal or state law and the rules and regulations of self-regulatory organizations, licensing boards, and other regulatory organizations. Such collateral consequences include, but are not limited to, a statutory disqualification with respect to membership or participation in, or association with a member of, a self-regulatory organization. This statutory disqualification has consequences that are separate from any sanction imposed in an administrative proceeding. In addition, in any disciplinary proceeding before the Commission based on the entry of the injunction in this action, Defendant understands that it shall not be permitted to contest the factual allegations of the complaint in this action.

11.    Defendant understands and agrees to comply with the Commission's policy "not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegation in the complaint or order for proceedings." 17 C.F.R. § 202.5. In compliance with this policy, Defendant agrees: (i) not to take any action or to make or permit to

3

be made any public statement denying, directly or indirectly, any allegation in the complaint or

creating the impression that the complaint is without factual basis; and (ii) that upon the filing of

this Consent, Defendant hereby withdraws any papers filed in this action to the extent that they

deny any allegation in the complaint. If Defendant breaches this agreement, the Commission

may petition the Court to vacate the Final Judgment and restore this action to its active docket.

Nothing in this paragraph affects Defendant's: (i) testimonial obligations; or (ii) right to take

legal or factual positions in litigation or other legal proceedings in which the Commission is not

a party.

12.    Defendant hereby waives any rights under the Equal Access to Justice Act, the

Small Business Regulatory Enforcement Fairness Act of 1996, or any other provision of law to

seek from the United States, or any agency, or any official of the United States acting in his or

her official capacity, directly or indirectly, reimbursement of attorney's fees or other fees,

expenses, or costs expended by Defendant to defend against this action. For these purposes,

Defendant agrees that Defendant is not the prevailing party in this action since the parties have

reached a good faith settlement.

13.    In connection with this action and any related judicial or administrative

proceeding or investigation commenced by the Commission or to which the Commission is a

party, Defendant (i) agrees to make available its employees and agents to appear and be

interviewed by Commission staff at such times and places as the staff requests upon reasonable

notice; (ii) will accept service by mail or facsimile transmission of notices or subpoenas issued

by the Commission for documents or testimony at depositions, hearings, or trials, or in

connection with any related investigation by Commission staff; (iii) appoints Defendant's

undersigned attorney as agent to receive service of such notices and subpoenas; (iv) with respect

4

to such notices and subpoenas, waives the territorial limits on service contained in Rule 45 of the

Federal Rules of Civil Procedure and any applicable local rules, provided that the party requesting

the testimony reimburses Defendant's travel, lodging, and subsistence expenses at the then-

prevailing U.S. Government per diem rates; and (v) consents to personal jurisdiction over

Defendant in any United States District Court for purposes of enforcing any such subpoena.

     14.    Defendant agrees that the Commission may present the Final Judgment to the

Court for signature and entry without further notice.

     15.    Defendant agrees that this Court shall retain jurisdiction over this matter for the

purpose of enforcing the terms of the Final Judgment.

Dated: _10/19/07_             Lucent Technologies Inc.

By: _____
        Stephen R. Reynolds
        General Counsel
        Alcatel Lucent
        600 Mountain Avenue
        Murray Hill, NJ 07974

     On _October 19th_ , 2007, _Stephen R. Reynolds_ , a person known to me, personally appeared before me and acknowledged executing the foregoing Consent with full authority to do so on behalf of _Alcatel-_ as its _General Counsel_
                Lucent

JANICE M. MITCHELL
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 9/2/2008

_____
Notary Public
Commission expires:

Approved as to form:

_____
Martin J. Weinstein, Esq.
Willkie Farr & Gallagher, LLP
1875 K Street, NW
Washington, D.C. 20006
Tel: (202) 303-1122

Attorney for Defendant

**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** : | |
| **100 F Street, N.E.** : | |
| **Washington, DC 20549** : | |
| **Plaintiff,** : | **C.A. No.** |
| : | |
| **v.** : | |
| : | |
| **LUCENT TECHNOLOGIES INC.,** : | |
| : | |
| **Defendant.** : | |

**FINAL JUDGMENT AS TO DEFENDANT LUCENT TECHNOLOGIES INC.**

The Securities and Exchange Commission having filed a Complaint and Defendant

Lucent Technologies Inc. having entered a general appearance; consented to the Court's

jurisdiction over Defendant and the subject matter of this action; consented to entry of this Final

Judgment without admitting or denying the allegations of the Complaint (except as to

jurisdiction); waived findings of fact and conclusions of law; and waived any right to appeal

from this Final Judgment:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant and

Defendant's agents, servants, employees, attorneys, and all persons in active concert or

participation with them who receive actual notice of this Final Judgment by personal service or

otherwise are permanently restrained and enjoined from violating, directly or indirectly, Section

13(b)(2)(A) [15 U.S.C. § 78m(b)(2)(A)] of the Securities Exchange Act of 1934 ("Exchange

Act"), by, with respect to any issuer which has a class of securities registered pursuant to Section

12 of the Exchange Act [15 U.S.C. § 78l] or any other issuer which is required to file reports

pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], failing to make and keep

books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the

transactions and dispositions of the assets of the issuer.

II.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant

and Defendant's agents, servants, employees, attorneys, and all persons in active concert or

participation with them who receive actual notice of this Final Judgment by personal service or

otherwise are permanently restrained and enjoined from violating, directly or indirectly, Section

13(b)(2)(B) [15 U.S.C. § 78m(b)(2)(B)] of the Exchange Act, by, with respect to any issuer

which has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C.

§ 78l] or any other issuer which is required to file reports pursuant to Section 15(d) of the

Exchange Act [15 U.S.C. § 78o(d)], failing to devise and maintain a system of internal

accounting controls sufficient to provide reasonable assurances that:

(a)     transactions are executed in accordance with management's general or specific

authorization;

(b)     transactions are recorded as necessary (i) to permit preparation of financial

statements in conformity with generally accepted accounting principles or any

other criteria applicable to such statements, and (ii) to maintain accountability of

assets;

(c)     access to assets is permitted only in accordance with management's general or

specific authorization; and

2

(d)     the recorded accountability for assets is compared with the existing assets at

reasonable intervals and appropriate action is taken with respect to any

differences.

III

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant shall pay a

civil penalty in the amount of $1,500,000 pursuant to Section 21(d)(3) [15 U.S.C. § 78u(d)(3)] of

the Exchange Act.  Defendant shall make the payment of $1,500,000 within ten (10) business

days after entry of this Final Judgment by certified check, bank cashier's check, or United States

postal money order payable to the Securities and Exchange Commission.  The payment shall be

delivered or mailed to the Office of Financial Management, Securities and Exchange

Commission, Operations Center, 6432 General Green Way, Mail Stop 0-3, Alexandria, Virginia

22312, and shall be accompanied by a letter identifying Lucent Technologies Inc. as a defendant

in this action; setting forth the title and civil action number of this action and the name of this

Court; and specifying that payment is made pursuant to this Final Judgment.  Defendant shall

simultaneously transmit photocopies of such payment and letter to the Commission's counsel in

this action.  Defendant shall pay post-judgment interest on any delinquent amounts pursuant to

28 USC § 1961.  The Commission shall remit the funds paid pursuant to this paragraph to the

United States Treasury.

IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Consent is

incorporated herein with the same force and effect as if fully set forth herein, and that Defendant

shall comply with all of the undertakings and agreements set forth therein.

3

V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain

jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.


Dated: _____, _____


_____

UNITED STATES DISTRICT JUDGE

4